## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| **JASON LaVEGLIA,** | | : | |
| | **Plaintiff,** | : | **CIVIL ACTION** |
| | | : | **No.** |
| **v.** | | : | |
| | | : | |
| **TD BANK, N.A.,** | | : | **JURY TRIAL DEMANDED** |
| | **Defendant.** | : | |

## C O M P L A I N T

### INTRODUCTION

1.      Jason LaVeglia, an American, was employed by T.D. Bank, N.A. (the "Bank") and its predecessor for more than fifteen years in a number of increasingly more responsible real estate management positions, the last of which was Vice President, Head of North American Real Estate Operations.  In that position and throughout his career with the Bank, plaintiff LaVeglia received stellar performance reviews, regular pay increases, bonuses, stock grants, and other awards.

2.      In June 2018, plaintiff LaVeglia was on an approved leave of absence under both the Bank's Parental Leave Policy and the Family Medical Leave Act ("FMLA") as the result of the birth of his second child and his wife's disability (she had been diagnosed with a life threatening auto-immune disease known as primary biliary cholangitis). Just weeks into his leave, on June 25, 2018, he was told that his position was being eliminated and he would be terminated shortly after his leave of absence concluded.

3.      Paul Whitehead, a Canadian, who had just been appointed as head of the Bank's Enterprise Real Estate Division in February 2018, was the person responsible for plaintiff LaVeglia's termination from employment.  While he told plaintiff LaVeglia that his job as Vice President, Head of North American Real Estate Operations was being eliminated due to a "reorganization,"  that was a pretext.

4.      Plaintiff LaVeglia's duties were not eliminated nor could they be: they were essential real estate functions that needed to be performed -- and continued to be performed -- both on and after June 25, 2018.  In fact, virtually all of the real estate functions that plaintiff performed were permanently reassigned by Mr. Whitehead to Michael Gould, a far less qualified Canadian, who at the time was an Assistant Vice President and who was promoted to Vice President as soon as plaintiff LaVeglia was terminated.

5.      The real motivation for the Bank's decision to terminate plaintiff LaVeglia's employment had nothing to do with the reorganization of its Enterprise Real Estate Division or for any other valid reason.  Rather, it was due to plaintiff's association with a disabled family member (his wife);  his need to take a leave of absence under the FMLA and the Bank's own Parental Leave Policy;  and the Bank's decision to favor Canadian employees over American employees based on their national origin.

6.      Based on these violations of his rights, plaintiff LaVeglia today has filed suit against the Bank to secure all the remedies to which he is entitled under each of the federal laws at issue here and to ensure compliance by the Bank with the promise it made

2

to its employees when it rolled out its Parental Leave Policy, *i.e.*, "All parents should have the opportunity to welcome their children home, without worrying about work or pay checks."

## PARTIES

7.      Plaintiff LaVeglia is a citizen of the Commonwealth of Pennsylvania and maintains his residence in Bucks County, Pennsylvania.

8.      The Bank is the American subsidiary of its Canadian-based parent company, the Toronto-Dominion Bank. It maintains offices and banks in this judicial district and has its headquarters located at 1701 Route 170 East, Cherry Hill, New Jersey 08003.

## JURISDICTION

9.      Plaintiff LaVeglia brings claims of associational discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), national origin discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"), retaliation under the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and breach of contract in violation of the Bank's Parental Leave Policy.

10.     Subject matter jurisdiction is conferred on this Court over plaintiff LaVeglia's ADA claim by 42 U.S.C. § 12117(a), over his Title VII claim by 42 U.S.C. § 2000e-5(f)(3), and over his FMLA claim by 29 U.S.C. § 2617(a)(2).

3

11.     Supplemental jurisdiction over his breach of contract claim is conferred on this Court by 28 U.S.C. § 1367(a).

12.     The Court has personal jurisdiction over the parties since the Bank regularly conducts business in this judicial district and plaintiff LaVeglia's claims for relief arose here.

**VENUE**

13.     Venue is properly laid in this Court under the special venue provisions of the ADA, Title VII and the FMLA.  Venue is proper under the general venue statute, 28 U.S.C. § 1391, over plaintiff's claim that the Bank breached its Parental Leave Policy by terminating his employment.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

14.     Plaintiff LaVeglia filed a Charge of Discrimination with the Philadelphia office of the Equal Employment Opportunity Commission ("EEOC") on September 17, 2018 (Charge Number 530-2018-05874).  The Charge averred national origin and association disability discrimination and retaliation against the Bank.

15.     The EEOC cross-filed plaintiff LaVeglia's Charge with the Pennsylvania Human Relations Commission.

16.     On or about March 27, 2019, plaintiff LaVeglia duly received a right-to-sue letter from the EEOC authorizing him to file this lawsuit against the Bank.

4

17.     This action has been timely filed within the suit-filing provisions of the

ADA, Title VII, and the FMLA and under Pennsylvania law for claims for breach of

contract.

## ADDITIONAL FACTUAL AVERMENTS

18.     Plaintiff LaVeglia was employed by the Bank and its predecessor for more

than fifteen (15) years in a number of increasingly more responsible real estate

management positions.

19.     Most recently, in September of 2015, plaintiff LaVeglia was assigned as the

Bank's Vice President and Head of North American Real Estate Operations.

20.     In that capacity, plaintiff LaVeglia was responsible for construction

management, facility management, transaction management, purchasing and contract

administration, and several other related duties.  His geographic responsibilities for real

estate functions included all of North America (both the United States and Canada).

21.     As Vice President, Head of North American Real Estate Operations,

plaintiff LaVeglia spent a significant amount of his time traveling away from home,

primarily to Canada, in the performance of his real estate duties and responsibilities.

22.     At all times throughout his employment with the Bank, plaintiff LaVeglia

was praised for his performance, leadership skills, and interpersonal relationships.

23.     In his annual performance evaluations, plaintiff LaVeglia was always rated

as "exceptional," "quality high," or "quality solid."

5

24.     Over the last five years of his employment with the Bank, plaintiff LaVeglia received the following ratings: "quality solid" in 2017; "quality high" in 2016; "quality high" in 2015; "exceptional" in 2014; and "exceptional" in 2013.

25.     As a result of his performance, plaintiff LaVeglia regularly received pay increases, bonuses, stock grants, and other awards in recognition of his contributions to the Bank and its Enterprise Real Estate Division.

26.     In September 2016, plaintiff LaVeglia's wife was diagnosed with primary biliary cholangitis ("PBC"), a rare life-threatening auto-immune disease that attacks the liver.

27.     After his wife's PBC diagnosis, plaintiff LaVeglia was still able to maintain his leadership position and outstanding performance with the Bank.  This was demonstrated in his 2016 and 2017 annual performance evaluations.

28.     In June 2017, the Bank launched its new Parental Leave Policy (the "Policy").  After the birth of a child, the Policy

> " . . . allows all eligible parents -- men and women -- to take
> up to 16 weeks of paid leave to care for their new child, while
> receiving pay, benefits and access to a range of
> resources . . . ."

A true and correct copy of the Bank's Policy is attached as Exhibit A.

29.     The Policy enables eligible parents to take parental leave within twelve (12) months of the date of a child's birth and was designed by the Bank to provide support to an eligible parent's "physical, financial, and emotional well-being."  Exhibit A, p. 2.

6

30.     Beth Webster, Head of Human Resources at the Bank, stated in a news release about the Policy:

> "All parents should have the opportunity to welcome their
> children home, without worrying about work or pay checks,
> which is why our new parental leave policy is so important to
> our employees."

31.     In another media release about the Policy, the Bank's public affairs department stated:  "Our 16 week parental leave policy leaves no parent behind."

32.     In the Policy itself, the Bank emphasized that eligible parents will have

> "job protection while on leave, meaning you will be
> reinstated to the same or equivalent position upon your return
> to work at the end of the leave."

Exhibit A, p. 5.

33.     On September 9, 2017, just three months after the Bank instituted the Policy, plaintiff LaVeglia's wife gave birth to their second child.

34.     Four months later, on January 21, 2018, plaintiff LaVeglia's father-in-law suffered a stroke.  This was significant because plaintiff LaVeglia's mother-in-law served as the primary caregiver for his two children, then aged three years and four months old.

35.     After his father-in-law's stroke, plaintiff LaVeglia's mother-in-law was unable to provide the same support to his small children because she needed to care for her husband who also had a pending back surgery scheduled in June 2018.

36.     On February 5, 2018, Paul Whitehead, a Canadian, assumed responsibility for its Enterprise Real Estate Division.  As a result, Mr. Whitehead became plaintiff LaVeglia's supervisor.

37.     Mr. Whitehead assumed this role despite hardly having any real estate experience.

38.     Shortly after assuming responsibility for the Enterprise Real Estate Division, Mr. Whitehead sent an e-mail to plaintiff LaVeglia on February 23, 2018, praising him for his knowledge, leadership, and dedication.

39.     Specifically, Mr. Whitehead's e-mail to plaintiff LaVeglia on February 23, 2018 stated:

> "I have truly appreciated all your help and support over the past couple of weeks as I come up the learning curve . . . your depth of knowledge, insight, and experience in this space [is] awesome and I have truly appreciated your patience with my questions . . . it's clear to me that nothing happens without you being involved."

A true and correct copy of this e-mail is attached as Exhibit B.

40.     As Mr. Whitehead recognized, based on his experience, qualifications, and skill, plaintiff LaVeglia was an essential member of the Bank's Enterprise Real Estate Division.

41.     In March 2018, plaintiff LaVeglia's wife's health condition began to deteriorate and she was advised by her doctors to take a leave of absence from her own job in order to reduce her stress, increase the amount she slept, and fend off the advancement of her PBC disease.

42.     Knowing that his wife needed additional care and his mother-in-law could no longer provide support for his small children, plaintiff LaVeglia decided to take a leave of absence pursuant to the Bank's Policy and the FMLA.

43.     Plaintiff LaVeglia knew that taking an approved leave of absence would enable him to care for his small children and provide support to his ailing wife, who was facing several doctor appointments in spring 2018 due to the advancement of her PBC disease.

44.     Plaintiff LaVeglia and his wife also decided that, after he returned to work from his leave of absence, they would hire a full-time caretaker in the event that his mother-in-law could not provide the necessary support for their children.

45.     On March 28, 2018, plaintiff LaVeglia notified Mr. Whitehead of his intention to take an approved leave of absence.

46.     Plaintiff LaVeglia was transparent with Mr. Whitehead and specifically informed him that:

       a.     his wife was diagnosed with PBC;

       b.     his wife's doctors recommended that she take a leave of absence from work;

       c.     his wife would continue to have doctors' appointments due to the advancement of her PBC disease in the future;

       d.     his wife needed to resign from her job by November 2018; and

   e.   his small children, including his newborn, needed additional

        care that resulted from his father-in-law's stroke and pending

        back surgery.

47.   During that conversation, Mr. Whitehead acknowledged plaintiff

LaVeglia's intention to exercise his rights to take an approved leave of absence.

48.   During the same conversation with Mr. Whitehead, plaintiff LaVeglia also

offered to assist and support the Bank's Enterprise Real Estate Division during his

approved leave of absence.

49.   On April 4, 2018, via conference call, plaintiff LaVeglia spoke with

Matthew Jabaut and Serena Lawrence, two of the Bank's Human Resources employees,

and informed them of his intention to take a leave of absence based upon the Bank's

Policy and the FMLA.

50.   In that call, plaintiff LaVeglia informed Mr. Jabaut and Ms. Lawrence that:

   a.   his wife was diagnosed with PBC;

   b.   his wife's doctors recommended that she take a leave of

        absence from work;

   c.   his wife would continue to have doctors' appointments due to

        the advancement of her PBC disease in the future;

   d.   his wife needed to resign from her job by November 2018;

        and

e.    his small children, including his newborn, needed additional

care that resulted from his father in-law's stroke and pending

back surgery.

51.    The next day, on April 5, 2018, the Bank formally approved plaintiff

LaVeglia's leave of absence under both its Policy and the FMLA.

52.    Plaintiff LaVeglia was specifically approved a leave of absence under the

Policy between May 28 until September 7, 2018 and a leave of absence under the FMLA

from May 28 until August 17, 2018.

53.    The Bank, through Paul Whitehead, subsequently made the decision that

Michael Gould, a Canadian, would assume plaintiff LaVeglia's job responsibilities on an

interim basis while he was on his approved leave.

54.    On May 4, 2018, Mr. Whitehead sent an e-mail to the Bank's Enterprise

Real Estate Division informing its employees that plaintiff LaVeglia would be  "taking a

four-month parental leave starting May 28, 2018" and that Michael Gould "will take on

the leadership of the Operations function in the interim."  A true and correct copy of this

e-mail is attached as Exhibit C.

55.    Because of plaintiff LaVeglia's wife's PBC disease and her plan to resign

her own job, plaintiff LaVeglia and his wife made the decision to add her and their

children to the Bank's medical benefits plan in November 2018.

56.    The Bank knew that its health care costs would increase substantially

because of Mrs. LaVeglia's disability.  In fact, the Bank acknowledged to the EEOC that

Mr. Whitehead knew that Mrs. LaVeglia had a medical condition and she needed to resign or retire from her job by November 2018.

57.     On June 8, 2018, while he was on his approved leave, plaintiff LaVeglia spoke with Mr. Gould by telephone and answered several of his questions regarding his interim job responsibilities.

58.     Just over two weeks later, on June 25, 2018, Mr. Whitehead and Mr. Jabaut called and spoke with plaintiff LaVeglia at his home in Bucks County and informed him that his position as Vice President, Head of North American Real Estate Operations was being eliminated as part of a reorganization of the Enterprise Real Estate Division.

59.     In addition, Mr. Whitehead and Mr. Jabaut told plaintiff LaVeglia that he would not be offered another position with the Bank and his employment would terminate on November 8, 2018.

60.     The Bank's explanation for eliminating plaintiff's job and terminating his employment was a pretext.

61.     Plaintiff LaVeglia's job duties and responsibilities were not eliminated, nor could they be:  they were essential real estate functions that needed to be performed -- and continued to be performed -- both on and after June 25, 2018.

62.     In fact, virtually all of plaintiff LaVeglia's job duties and responsibilities were permanently reassigned to Mr. Gould, a far less experienced and qualified Canadian employee and who had not been on leave of absence to care for a family member or for any other reason.

63.    In addition to taking over the bulk of plaintiff LaVeglia's job functions, Mr.

Gould (Canadian) was also promoted from his prior title of Assistant Vice President to

that of Vice President -- the same job title that Mr. LaVeglia had before his job was

eliminated.

64.    The decision to assign Mr. Gould as plaintiff LaVeglia's replacement and

to promote him to plaintiff LaVeglia's prior title of Vice President was made by Mr.

Whitehead with the involvement and consent of other senior executives of the Bank's

Canadian parent-company.

65.    At the direction of Mr. Whitehead, the Bank also favored other Canadian

employees over qualified Americans who worked with plaintiff LaVeglia in the United

States. It did so by eliminating and terminating their employment under the guise of the

Enterprise Real Estate Division's reorganization.

66.    As a result, virtually all the critical executive real estate management

functions with North American accountability for the Bank are being, or will be,

performed by Canadians.

67.    Mr. Whitehead's preferential treatment of Canadian employees during the

Enterprise Real Estate Division's reorganization is demonstrated by the following:

- 75% of the executives who had their jobs eliminated on or about June 25, 2018 were United States employees (Mr. LaVeglia, Pay Wu, and Steph Eckersley Ray).  Greg Quinn was the only Canadian executive who had his job eliminated and he was disliked by Mr. Whitehead.

13

- Prior to the reorganization on or about June 25, 2018, four (4) United States executives with North American geographic mandates reported to Mr. Whitehead (66%).  After the reorganization on or about June 25, 2018, only one (1) United States executive with a North American mandate reported to Mr. Whitehead (16.67%).

- Prior to the reorganization on or about June 25, 2018, there were three (3) United States executives with North American geographic mandates with a job title of Vice President (including Mr. LaVeglia).  After the reorganization on or about June 25, 2018, there was only one (1) United States executive with a North American geographic mandate with a job title of Vice President.

- Prior to the reorganization on or about June 25, 2018, Mr. LaVeglia (United States) and Ms. Wu (United States) were responsible for supervising four (4) other executives.  After the reorganization on or about June 25, 2018, Scott Hite was the only United States employee assigned a supervisory role over other executives.

- To date, the reorganization has seen two (2) Candians – Shahz Beig and David Dal Bello – assume executive positions within the Enterprise Real Estate Division with North American Mandates even though they lack prior real estate experience. In addition, the reorganization has seen two (2) other Canadians – Michael Gould and Ana Radic – assume executive positions within the Enterprise Real Estate Division with North American mandates.

14

## CLAIMS FOR RELIEF

### Count I

### Associational Discrimination Under The ADA

68.     Plaintiff LaVeglia repeats and incorporates by reference the allegations set out in paragraphs 1 through 67 of his Complaint.

69.     Not only may disabled individuals bring actions for employment discrimination under the ADA, 42 U.S.C.A. §§ 12101 *et seq.*, but also those individuals, otherwise qualified for the employment, who have been discriminated against because of their relationship or association with disabled individuals.

70.     The Bank violated § 12112(b)(4) of the ADA by eliminating plaintiff LaVeglia's position as Vice President, Head of North American Real Estate Operations and subsequently terminating his employment because of the unfounded assumption/fear that he would be distracted at work or would be unable to perform his essential real estate management position that required frequent time away from his family due to his wife's life-threatening auto-immune disease and his father-in-law's stroke.

71.     Relatedly, by terminating his employment after learning that his wife would need to resign from her employment and would subsequently be covered under its health plan starting in fall 2018, the Bank also violated § 12112(b)(4) of the ADA.

72.     As a direct and proximate result of Defendant's violations of his rights under § 12112(b)(4) of the ADA, plaintiff LaVeglia has suffered a loss of earnings and

earning capacity including, but not limited to, a loss of wages, bonuses, stock grants, other financial incentives, and benefits to which he was otherwise entitled.

73.     As a further direct and proximate result of the Bank's violation of his ADA rights, plaintiff LaVeglia suffered physical pain and emotional distress, humiliation, embarrassment, loss of self-esteem and loss of the enjoyment of life's pleasures.


## Count II

## National Origin Discrimination Under Title VII

74.     Plaintiff LaVeglia repeats and incorporates by reference the allegations set out in paragraphs 1 through 73 of his Complaint.

75.     By permanently reassigning his job responsibilities to Mr. Gould, a far less experienced and qualified Canadian employee and subsequently terminating his employment, the Bank violated plaintiff LaVeglia's right to equal employment opportunity as guaranteed by § 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1).

76.     As a direct and proximate result of Defendant's violation of his Title VII rights, plaintiff LaVeglia has suffered a loss of earnings and earning capacity, including, but not limited to, a loss of wages, bonuses, stock grants, other financial incentives, and benefits to which he was otherwise entitled.

77.     As a further direct and proximate result of defendant's violation of his Title VII rights, plaintiff LaVeglia has suffered physical pain and emotional distress, humiliation, embarrassment, loss of self-esteem and loss of the enjoyment of life's pleasures.

16

## Count III

## FMLA Discrimination and Retaliation

78.     Plaintiff LaVeglia repeats and incorporates by reference the allegations set out in paragraphs 1 through 77 of his Complaint.

79.     The FMLA allows qualifying employees to take up to twelve (12) weeks of unpaid leave so that they can attend to family members who may suffer from certain medical problems.  To thwart attempts by employers to discriminate against employees for taking such leave by retaliating against them, Congress made such actions a violation under § 2615(a)(2) of the FMLA.

80.     Plaintiff LaVeglia was notified on June 25, 2018 by Paul Whitehead and Matthew Jabaut that his position was being eliminated and that he would not be offered another position by the Bank while he was on an approved leave under the FMLA.

81.     As a result, plaintiff LaVeglia was notified that his employment would terminate while he was on FMLA protected leave.

82.     The Bank's elimination of plaintiff's position and termination of his employment was a willful, intentional violation of his rights under the FMLA.

83.     As a direct and proximate result of the Bank's violation of his rights under § 2615(a)(2) of the FMLA, plaintiff has suffered a loss of earnings and earnings capacity including, but not limited to, a loss of wages, bonuses, stock grants, other financial incentives, and benefits to which he was otherwise entitled.

## Count IV

## Breach of Contract Under The Policy

84.    Plaintiff LaVeglia repeats and incorporates by reference the allegations set out in paragraphs 1 through 83 of his Complaint.

85.    At all relevant times, the Bank was a party to the Policy which it provided and conveyed to plaintiff LaVeglia and, under which, it guaranteed him sixteen (16) weeks of paid leave and promised him reinstatement to the same or an equivalent position upon his return to work.

86.    Plaintiff LaVeglia relied on the Bank's Policy and intended to return to his full time position on September 10, 2018 as Vice President, Head of North American Real Estate Operations.

87.    The Bank breached the Policy by notifying plaintiff LaVeglia on June 25, 2018, while he was on his approved parental leave, that his position was being eliminated and that he would not be offered another position by the Bank.

88.    The Bank's failure to reinstate plaintiff LaVeglia to the same or an equivalent position upon his return to work was a material breach of its Policy.

89.    Plaintiff LaVeglia relied on the Policy's guarantee that, upon taking sixteen (16) weeks of paid leave, he would be reinstated to the same or an equivalent position by the Bank.

90.    As part of the reorganization of the Bank's Enterprise Real Estate Division, plaintiff LaVeglia was the only employee who took parental leave under the Policy and

18

subsequently had their job eliminated.  In turn, the Bank denied plaintiff LaVeglia's reinstatement to the same or an equivalent position because he took leave under the Policy.

91.     As a direct and proximate result of this breach of this Policy, plaintiff LaVeglia incurred a loss of earnings and earnings capacity including, but not limited to, a loss of wages, bonuses, stock grants, other financial incentives, and benefits to which he was otherwise entitled.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff LaVeglia respectfully requests that judgment be entered in his favor and against the Bank, and that he be provided with the following relief:

      a.     An award of back pay including, but not limited to, an award for lost wages and retroactive benefits, together with pre-judgment interests;

      b.     An award of front pay if, as it appears, reinstatement is not feasible;

      c.     An award of compensatory damages for all of the non-economic injuries that plaintiff LaVeglia suffered;

      d.     An award of liquidated damages under the FMLA;

      e.     An award of punitive damages under the ADA and Title VII;

f.     An award of reasonable counsel fees and costs;  and

g.     Such other legal and equitable relief as may be just and

proper under the circumstances.


**<u>JURY DEMAND</u>**

Plaintiff Jason LaVeglia demands a trial by jury on all legal claims asserted in his

Complaint.


RAYNES LAWN HEHMEYER

By: _____

Harold I. Goodman, Esquire
Noah J. Goodman, Esquire
1845 Walnut Street
20th Floor
Philadelphia, PA 19103
215-568-6190

Attorney for Plaintiff Jason LaVeglia

Dated:  May 2, 2019

in you



# Exhibit A

Your life

Welcoming a new child is special and challenging — there's no doubt about it! One of our commitments to our people is to invest in the things that matter to them, like compensation, benefits, extraordinary experiences and more!

That's why we're proud to offer **TD's Paid Parental Leave program.** It provides up to 16 weeks paid leave to all eligible parents — men and women -- welcoming a new child into their family. It's just one way we can support you and your family's physical, financial and emotional well-being.



# Exhibit A
# 2 of 10

# Exhibit A

Your life

## What's Inside

Overview .................................................. 4
Eligibility .................................................. 6
Required Steps Before, During and After Leave ..... 7
Additional Information and Support ..................... 9



This Guide provides an overview of TD's Paid Parental Leave program and information on other available resources.

For additional details on specific policies, please refer to the **Employee Handbook** on **www.TDTotalRewards.com** (Life > Leave of Absence). If you have questions, call the HR Contact Center at **1-844-275-8347**. Where there is any discrepancy between the information contained in this Guide and the Employee Handbook, the Employee Handbook will govern.

# Exhibit A
# 3 of 10

# Exhibit A

Your life

## Overview

Important Note

TD's Paid Parental Leave program runs concurrently with other leaves or benefits you may be eligible for, such as Family Medical Leave Act (FMLA) and Short-Term Disability (STD) pay, and is inclusive of applicable federal, state and city leave benefits. Aetna, our Leave Administrator, will help you understand if any of these benefits apply to you and how to coordinate them with the TD Paid Parental Leave program.

TD's Paid Parental Leave program allows all eligible parents — men and women — to take up to 16 weeks of paid leave to care for their new child, while receiving pay, benefits and access to a range of resources.

### Up to 16 Weeks Paid Leave

- Paid Parental Leave must be taken on a **continuous basis** — this means you cannot use a portion of your 16 weeks, return to work and then use the remainder at a later date.

- **If you are giving birth,** your Paid Parental Leave begins on the date of birth. This ensures all leaves related to the birth of your child are taken concurrently.

- **If you are not giving birth,** your Paid Parental Leave can begin on the date of birth, placement or adoption of your child or at a later date. **If you are adopting,** you have the option to begin your Paid Parental Leave up to one week prior to the placement or adoption date.

- In all cases, your Paid Parental Leave must be completed **within 12 months** of the date of birth, placement or adoption of your child.

- **Additional time is not provided** in cases of multiple births (e.g., twins) or adoptions.



**Exhibit A**
**4 of 10**

# Exhibit A

## Your life

### Pay, Benefits and Job Protection

While on Paid Parental Leave, your pay and benefits will
continue as follows

- **Pay** will continue and is based on your standard weekly hours
  as of the last day of work before your leave begins
  - For exempt (salaried) Employees, this is your weekly salary
  - For non-exempt (hourly) Employees, this is your hourly
    wage multiplied by standard weekly hours (20, 30 or 40)
  - If you are a commission status Employee, you will receive
    pay as described above, plus you will be paid a weekly
    average of commissions over the 12 months preceding the
    start of Paid Parental Leave
- **TD benefits** coverage (medical, dental, vision and life
  insurance) and payroll deductions will continue
- **TD 401(k) Retirement Plan** deductions and matching
  contributions will continue.
- **Paid Time Off** (PTO) accrual will continue
- You will have **job protection** while on leave, meaning you will
  be reinstated to the same or equivalent position upon your
  return to work at the end of the leave
- Paid Parental Leave earnings are not included in the
  calculation of **bonus or incentive plan payments**, subject to
  the terms of the applicable incentive plan.

### A Range of Resources to Support You

Thinking about adopting? Need help budgeting for life with
your new child, finding caregivers or just need to talk to
someone? TD has you covered. See pages 9-10 for details

*"We believe providing paid
leave to all eligible parents
welcoming a new child is
the right thing to do. And
because welcoming a child
into your life through birth
or adoption is a truly precious
occasion, we want our new
parents to enjoy that special
time with their growing family."*

**Beth Webster,**
Head of Human Resources

# Exhibit A
# 5 of 10

# Exhibit A

Your life

## Eligibility

To be eligible for TD's Paid Parental Leave program
you must meet all of the following criteria:

- You must have worked at TD for at least 12 months as of the
  date of birth, placement or adoption of your child

- At least 30 days before the expected date of birth, placement or
  adoption of your child, you must provide notification to Aetna (TD's
  Leave Administrator) by calling 1-866-721-2394. Also, you must
  provide written notice (via email) to your People Manager. (See
  pages 7-8 for other required steps.)

- You must have standard weekly hours at 20 or more

- During the 12 months before the date of birth, placement or
  adoption of your child, you must have worked a minimum
  number of hours based on your standard weekly hours category.
  See the table below to determine how many hours you have to
  work to be eligible

To confirm your standard hours category, go to MyHR >
Employee Self-Service > Personal Information > Personal
Information Summary > Job Information section

If you are welcoming a new
child and are not eligible for
TD's Paid Parental Leave program,
you may be eligible for other
benefits or leaves, including PTO,
Short-Term Disability (STD) pay
and/or the Family Medical
Leave Act (FMLA). Refer to the
Employee Handbook on
www.TDTotalRewards.com
for more information.

| STANDARD WEEKLY HOURS CATEGORY | NUMBER OF HOURS WORKED DURING 12 MONTHS BEFORE BIRTH, PLACEMENT OR ADOPTION OF CHILD |
|---|---|
| 40 | 1,250 |
| 30 | 940 |
| 20 | 630 |

Note: Hours worked includes regular and overtime hours but not Paid Time Off (PTO) or
any other time for which you were paid but not working



6

# Exhibit A
# 6 of 10

# Exhibit A

Your life

## Check List: Required Steps Before, During and After Leave

Congratulations! You are looking forward to welcoming a new child. We know you probably have a lot on your mind – including what you need to do to take full advantage of TD's Paid Parental Leave program. We've made that as easy as checking the box so you can focus on preparing for the newest member of your family.

Follow the steps below to check-off what you need to do before, during and after your leave.



* If you leave work prior to the date of birth, you may be eligible for other leave of absence or Short-Term Disability (STD) benefits between when you stopped working and when TD's Paid Parental Leave benefits begin. Notify Aetna immediately if you go out of work before the birth of your child.

# Exhibit A
# 7 of 10

# Exhibit A

Your life



| LEAVE BEGINS | **DAYS AFTER BIRTH, PLACEMENT OR ADOPTION** 31 | **DAYS BEFORE RETURNING TO WORK** 14 | RETURN TO WORK |

If you will need a Mother's Room for lactation purposes upon your return to work, contact the HR Contact Center at 1-844-275-8347 at the start of your leave.

Enroll your new child in medical coverage within 31 days of birth, placement or adoption.

The birth, placement or adoption of a child is considered a Qualified Life Event (QLE) by the IRS. That means you can make changes to your TD benefit elections and coverage outside of the annual Open Enrollment period.

*Note. You must complete this process within 31 days of the birth, placement or adoption of your child or your child will NOT have medical coverage through a TD medical plan. You will have to wait until the next Open Enrollment period to cover your child.*

Refer to the Resources > Benefit Changes During the Year page on www.TDTotalRewards.com for instructions on adding a new dependent to your medical coverage.

At least 14 days before returning to work, confirm your return to work date by contacting your People Manager by phone or email and calling Aetna at 1-866-721-2394.

If you require a special accommodation or would like to propose a schedule change, contact your People Manager as soon as possible so your request can be considered prior to your return.

On the day you return to work, notify Aetna by calling 1-866-721-2394 to confirm you have returned.

8

# Exhibit A
# 8 of 10

# Exhibit A



Your life

# We've Got You Covered: Additional Information and Support

In addition to Paid Parental Leave, TD provides you with a range of resources.



**Know you and your family have support**

Experienced LifeWorks consultants are available to help you and your family, at no cost, with:

- Budgeting for your new child.
- Finding caregivers (including an online childcare search for facilities and in-home daycare, plus guidance on how to find the best childcare for you and your family).
- Locating baby-proofing experts.
- Dealing with common parenting concerns (including returning to work).
- Providing four, in-person counseling sessions.

For more information, log into **www.lifeworks.com** (username is tdbank and password is lifeworks). There is no cost to use LifeWorks; it's entirely paid for by TD and available to Employees and their family members.



**Contact your medical plan carrier about their programs and rewards**

Medical plan carriers provide different programs to support you throughout your pregnancy and when your baby arrives. Examples of programs and rewards include:

- Maternity programs
- Tips on a range of topics throughout your pregnancy, such as good nutrition, immunizations, preventing birth defects, and more
- Lactation support services
- Breast pumps and supplies



**Take advantage of Adoption Assistance, if applicable**

TD reimburses a portion of expenses related to the adoption of a child under the age of 18 (for Employees with standard work hours of 30 or more). Visit www.TDTotalRewards.com for more information.



**Understand how your medical plan covers services**

Remember, it costs less when you stay in-network. Now is also a good time to review how your medical plan covers maternity-related visits and services

> Reminder: Using these online resources is voluntary and not required. They are for personal use, so any charges incurred for data use or time spent using them are not eligible for compensation.

Exhibit A

**9 of 10**

# Exhibit A

Your life

# Additional Information and Support

 Use tax-free dollars to pay for eligible expenses

Many baby-related products, such as pre-natal vitamins, baby monitors, thermometers and breast pumps/accessories, are considered eligible healthcare expenses under a Healthcare Flexible Spending Account (FSA) or Health Savings Account (HSA).

Note: You must have elected to contribute to a Healthcare FSA or selected a medical plan that is paired with an HSA during the most recent Open Enrollment in order to use tax-free dollars to pay for eligible expenses.

Visit www.TDTotalRewards.com for more information.

 Request a Mother's Room

If you anticipate needing access to a Mother's Room to express breast milk when you return to work, please contact the HR Contact Center by phone at 1-844-275-8347 or email at USAskHR@td.com when you start your leave.

It is important to provide TD with advance notice to ensure the availability of a Mother's Room when you return from leave.



TD's Paid Parental Leave program is an important part of your Total Rewards package. Your Total Rewards package is everything you get from TD in return for everything you do to help us deliver on our purpose to enrich the lives of our Customers, colleagues and communities. It includes base salary, variable compensation, health and wellness benefits, retirement programs, paid time off, recognition and training programs, and volunteer grants.

Visit www.TDTotalRewards.com for more information.

Exhibit A
10 of 10

Note: Where there is any discrepancy between the information contained herein and the Paid Parental Leave policy, the Paid Parental Leave policy will govern.

# Exhibit B

**Laveglia, Jason**

| | |
|---|---|
| **From:** | Whitehead, Paul |
| **Sent:** | Friday, February 23, 2018 7:10 PM |
| **To:** | Laveglia, Jason |
| **Subject:** | You |

Jason.....thanks for your engagement on the call earlier ...... much appreciated.

I have truly appreciated all your help and support over the past couple of weeks as I come up the learning curve............ your depth of knowledge, insight and experience in this space awesome and I have truly appreciated your patience with my questions.......... its clear to me nothing happens without you being involved.

I hope the conversation with the team will be helpful as we move forward (let me **know** if you think otherwise)..... there is so much talent and varried experience we should be able to **really** turn the dial here...........especially with the great puzzles we are looking to solve for. Exciting **times**!

Have at terrific weekend with the family. I look forward to connecting next week.

**Paul C. Whitehead, Jr.**
**Senior Vice President TD Bank Group**
**Enterprise Real Estate**
**Canadian Market & Network Planning**

1

# Exhibit B
# 1 of 1

# Exhibit C

---

**Laveglia, Jason**
_____

| | |
|---|---|
| **From:** | ERECommunications, TD |
| **Sent:** | Friday, May 04, 2018 1:40 PM |
| **To:** | ERECommunications, TD |
| **Cc:** | Lawrence, Serena |
| **Subject:** | FYI: Announcement - Jason LaVeglia |
| | |
| **Importance:** | High |

---

| | |
|---|---|
| To: | ERE – Canada and US |
| From: | Paul Whitehead, SVP, ERE, Canadian Market & Network Planning |
| Subject: | FYI: Announcement – Jason LaVeglia |

---

I would like to inform you that <u>Jason LaVeglia</u>, VP, ERE Operations, is taking a four-month parental leave starting May 28, 2018. Jason is a key member of my leadership team, and we wish him well as he focuses on his family over the coming months.

I am pleased to announce that <u>Michael Gould</u>, AVP, ERE Program Management Office, will take on the leadership of the Operations function in the interim. Michael needs no introduction to the ERE team. In his current role, Michael has provided strategic oversight of several large and complex ERE initiatives that he has delivered with excellence, speed and accuracy. He also previously led the Canadian Retail Operations team including Project Management, Facilities Management and Transaction Management and has a good understanding of the function. With his inspirational style of leading by example and his strong relationship skills at all levels in the organization, Michael has a high level of engagement with his team and partners.

The following employees will report to Michael:
- **Michael Sewall**, AVP, NA Project Management
- **Jon Dawson**, AVP, NA Transaction Management
- **John DeBenedictis**, Senior Manager, Canadian Facilities Management
- **Sean Coakley**, Senior Manager, US Facilities Management
- **Iris Bensch**, Senior Manager, NA Real Estate Operations

With this change, **Kelly Gray-Harley**, Senior Manager, ERE PMO will lead the Canadian PMO team and **Anthony Betterson**, Senior Manager, ERE PMO will lead the US PMO team. Both Kelly and Anthony will report to Kristi Ferguson, VP, ERE.  Giselle DiSimone and Margaret Beeton will report to Kelly. All other reporting relationships will remain the same.

Please join me in welcoming Michael to the leadership team and wishing him success in this interim role.

Paul

1

# Exhibit C
# 1 of 1