**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JASON LAVEGLIA,** | **Case No.  2:19-cv-01917-JDW** |
| *Plaintiff,* | |
| v. | |
| **TD BANK, N.A.,** | |
| *Defendant.* | |

## MEMORANDUM

      TD Bank terminated Jason LaVeglia. On that much, the Parties agree. TD says it did so as part of a reorganization that left no position open for Mr. LaVeglia. Mr. LaVeglia says TD's real reasons were more nefarious. He points to several inconsistencies in TD's story that he says demonstrate that TD's real reason for his termination is different than its stated reason. This is, in some respects, a case where the whole is greater than the sum of the parts. It is not clear that any of the inconsistencies that Mr. LaVeglia has uncovered would be enough, on its own, to permit him to go to trial. However, when the Court views them all together, as it must, and takes them in the light most favorable to Mr. LaVeglia, as it must, they satisfy Mr. LaVeglia's burden of showing that TD's stated reason was a pretext for its decision to terminate him. A jury will have to decide the real reason TD terminated him. However, a jury will not get to decide whether TD breached a contract with Mr. LaVeglia because Mr. LaVeglia has not established that TD's Parental Leave Policy created a contract between TD and Mr. LaVeglia.

I.      **FACTS**

A.      **Mr. LaVeglia's Employment With TD**

Mr. LaVeglia started working at TD in 2009, receiving various promotions during his employment and becoming the Head of Enterprise Real Estate ("ERE") Operations in May 2017. In that position, he oversaw construction management, facilities management, transaction management, and project management for TD's North American real estate portfolio.

Two of TD's employment policies are at issue in this case. TD's Employee Handbook contains an FMLA policy, which states, "Employees who return to work from FMLA Leave . . . are entitled to return to their job or an equivalent position without the loss of benefits or pay unless . . . their employment with the Company would have been terminated if no leave had been taken." (ECF No. 57-3 at Ex. 1.) The Handbook also contains a Parental Leave policy, which states, "Employees who return to work as expected at the end of their approved paid Parental Leave will be reinstated to their original position or an equivalent job with the same pay/benefits unless their employment would have otherwise been terminated and paid Parental Leave not been taken." (ECF No. 59-3 at Ex. 6.)

Mr. LaVeglia received performance reviews of "Exceptional" in 2013 and 2014, "Quality High" in 2015 and 2016, and "Quality Solid" in 2017. These range from the top of the scale to the middle. The 2016 performance review highlighted a number of Mr. LaVeglia's strengths and described him as a "critical leader in ERE." (ECF No. 59-5 at Ex. 24.) It also described ways that Mr. LaVeglia's performance could improve. In the 2017 performance review, Mr. LaVeglia's supervisor described him as an "outstanding technical leader of the operations function," said he did a "very good job of taking the business with all of it's [sic] issues and performing very well," and noted that the "execution in the field is terrific." (ECF No. 59-5 at Ex. 25.) However, Mr.

LaVeglia's supervisor also highlighted difficulties that Mr. LaVeglia encountered and needed to improve.

Mr. LaVeglia also received informal feedback on his job performance. His supervisor Gerard Guidice praised him between the 2016 and 2017 performance review. Then on February 23, 2018, a new supervisor, Paul Whitehead, told Mr. LaVeglia in an email that Mr. Whitehead "truly appreciated all your help and support ... your depth of knowledge, insight, and experience in this space [is] awesome ... it's clear to me that nothing happens without you being involved." (ECF No. 59-5 at Ex. 26.)

On March 28, 2018, Mr. LaVeglia told Mr. Whitehead he decided to take a leave of absence under the Bank's Parental Leave Policy. Mr. LaVeglia told Mr. Whitehead that his wife had an autoimmune disease and his father-in-law had a stroke. Mr. LaVeglia took a paid leave of absence from May 25, 2018, until September 10, 2018.

**B.** **TD's Reorganization Of ERE And Termination Of Mr. LaVeglia**

In the Fall of 2017, TD began an optimization review of the ERE Department in order to create a "Target Operating Model" (TOM). Mr. Whitehead worked on the TOM review. He concluded that a "hybrid model" would work best for ERE: certain positions would be responsible for functions performed in either Canada or the U.S.; and other positions would be responsible for functions on a larger scale. This model eliminated, added, and modified positions in the ERE Department. The reorganization impacted roughly 60 of the 200 ERE positions, resulting in 25 exits from TD.

At some point, Mr. Whitehead decided to eliminate the Head of ERE Operations position and split the responsibilities of that position into two different positions—Head of Transactions & Portfolio Strategy ("TPS") and Head of Construction and Facilities Management ("CFM"). As of April 2, 2018, Mr. Whitehead sent an email that discussed his "final thoughts" concerning the

reorganization of the ERE Department. An attachment to that email listed Mr. LaVeglia as the head of CFM. In May 2018, TD employees prepared a "Communication Touch Plan" that outlined the communications that TD would undertake as part of the reorganization of the ERE Department. That Communication Touch Plan, dated May 11, 2018, indicated that Mr. Whitehead was to call Mr. LaVeglia to tell Mr. LaVeglia that he would be assigned to the CFM position.

Mr. Whitehead changed course, however. On or about May 16, 2018, Mr. Whitehead decided to terminate Mr. LaVeglia. A revised Communications Touch Plan dated May 31, 2018, indicates that TD was having discussions about terminating Mr. LaVeglia. On June 25, 2018, while Mr. LaVeglia was on his leave of absence, Mr. Whitehead informed Mr. LaVeglia by phone that the Bank eliminated his position as part of the TOM. Because Mr. LaVeglia was on a leave of absence on June 25, 2018, he received a 60-day paid notice period upon his return, from September 10, 2018 until November 8, 2018. Although TD maintains that Mr. Whitehead considered Mr. LaVeglia for both CFM and TPS, he did not receive an offer for either role. Instead, Michael Gould, then Associate Vice President or Program Management Office and ERE, and an individual of Canadian origin, assumed the role of CFM. After many months, TD hired an external candidate—located in Canada—for the TPS position, who then left TD in early 2019. Mr. LaVeglia maintains that this means all of the duties that he had performed as Head of ERE continued to be performed by Mr. Gould.

### C.    Procedural History

Mr. LaVeglia filed this action in May 2019. He filed an Amended Complaint on September 19, 2019. In the Amended Complaint, he asserts claims for associational discrimination under the Americans with Disabilities Act and the Pennsylvania Human Relations Act (Counts I, V), national origin discrimination under Title VII and the PHRA (Counts II, VI), discrimination/retaliation

under the Family and Medical Leave Act (Count III), and breach of contract (Count IV). TD has moved for summary judgment on all claims.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). The filing of cross–motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id*. at 560 (citation omitted).

## III.   ANALYSIS

### A.   Preliminary Matters

#### 1.   Presumptions based on supervisor's membership in a protected class

In its Motion, TD argues that the Court should presume Mr. Whitehead did not discriminate against Mr. LaVeglia on the basis of disability or national origin because Mr. Whitehead is in the same protected classes as Mr. LaVeglia:  he has a disabled relative and is an American citizen. That is, in a case about whether it discriminated against someone in a protected class, TD wants

the Court to make presumptions about how Mr. Whitehead acted based only on his membership in protected classes. TD is not the first party that the Court has seen make such an argument. It is not an argument the Court wants to see in the future.

TD's argument would make the Court complicit in discrimination in its own right. Courts should not and do not presume that individuals will act a certain way based on their membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 75 (1998) ("this Court has rejected any conclusive presumption that an employer will not discriminate against members of his own race"); *Terry v. Yeadon Borough*, No. CIV. A. 12-6205, 2013 WL 6536510, at *2 (E.D. Pa. Dec. 13, 2013) ("Although Defendants argue that racial discrimination is not plausible here because most of the Individual Defendants are African–American, like Plaintiff, an equal protection claim cannot be dismissed merely because the defendant and plaintiff belong to the same race"); *Poliard v. Saintilus Day Care Ctr., Inc.,* No. 11 CV 5174 MKB LB, 2013 WL 1346238, at *4 n. 4 (E.D.N.Y. Mar. 7, 2013), *report and recommendation adopted,* No. 11-CV-5174 MKB, 2013 WL 1346398 (E.D.N.Y. Apr. 2, 2013) ("The fact that plaintiff's supervisor is also Haitian does not preclude an inference of discriminatory intent.").

If Mr. LaVeglia, or any plaintiff, asked a court to presume discrimination based only on the fact that the plaintiff's supervisor was not in the plaintiff's protected class, TD would scream "bloody murder." And it would be right to do so. Arguments suggesting that people act in a certain way based on their membership in a protected class have no place in the judicial system. Attorneys should not make them, and the Court will not consider them.

Congress passed the statutes at issue in this case to end invidious discrimination. As the Supreme Court has said, the "way to stop discrimination … is to stop discriminating …." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748, 127 S. Ct. 2738, 2768, 168 L. Ed. 2d 508 (2007). It is not to employ discriminatory presumptions. There are many

employment cases before the Court. Companies often feel wrongly accused, and some are. Employers should defend themselves vigorously. But they should not resort to discriminatory, stereotypical presumptions to do so. The Court therefore will not make any presumptions about Mr. Whitehead, or anyone else, based on his membership in protected classes, either in this case or any other.

### 2.      Expert testimony

Mr. LaVeglia bases his pretext arguments in part on opinions from his expert Professor Natalie Pedersen. TD argues that Prof. Pedersen's opinions are not admissible under Fed. R. Evid. 704. This Court's Policies and Procedures provide that a party basing a summary judgment motion on the inadmissibility of expert testimony must file a contemporaneous motion. The record before the Court demonstrates why. Motions to exclude expert testimony require complex factual development and legal analysis. The Court does not have that. It has the types of abbreviated arguments that its Policies are intended to avoid. TD has not explained its failure to comply with the Court's Policies and Procedures. As it turns out, though, the Court does not need to consider Prof. Pedersen's opinions to find pretext. Her opinions therefore do not factor into the Court's analysis. TD will have an opportunity to challenge the admissibility of Ms. Pedersen's opinions in due course.

### B.      Discrimination Claims

All of Mr. LaVeglia's discrimination claims operate under the three-step *McDonnell-Douglas* framework. Under *McDonnell-Douglas*, an employee must establish a *prima facie* case of discrimination, the employer has a burden of production (but not persuasion) to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 n. 11 (3d Cir.2004). If the employer articulates such a reason, the employee must then proffer evidence to allow a reasonable factfinder to find by a preponderance

of the evidence that the employer's proffered reasons are false or pretextual. *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir.2003) (*per curiam*).

### 1.    *Prima facie* case

TD concedes, for purposes of its Motion, that Mr. LaVeglia has established a *prima facie* case of national origin discrimination, but it disputes that he has done so for his ADA and FMLA claims. For both claims, TD's argument challenges only the causation element. The same evidence satisfies Mr. LaVeglia's burden of showing causation for both claims.

The ADA's "association provision" protects qualified individuals from employment discrimination based on the "known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). The Third Circuit has not established a test for associational discrimination, but it has enumerated circumstances under which a plaintiff might establish such a claim, including (a) termination based on a disabled relative's perceived health care costs to the company or (b) distraction as a result of a relative's disability that does not require an accommodation. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 511 n. 7 (3d Cir.2009) (*citing Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir.2004)). At least one court in this District has formulated a *prima facie* test for discrimination by association, and the Court will apply that test here: (1) the plaintiff was qualified at the time of the adverse employment action; (2) he was subject to an adverse employment action; (3) at the time of the adverse employment action, the plaintiff was known by his employer to have a relative or an associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the termination decision. *See Pollere v. USIG Pa., Inc.*, 136 F.Supp.3d 680, 685, No. 15–2421, 2015 WL 9260053, at *3 (E.D. Pa. Dec. 18, 2015) (*citing Barthalow v. David H. Martin Excavating, Inc.*, No. 5–2593, 2007 WL 2207897, at *3 (M.D. Pa. July 30. 2007)); *see*

*also Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997) (applying the same *prima facie* test for "association discrimination" under ADA § 102(b)(4), 42 U.S.C. § 12112(b)(4).

The FMLA provides protection against discrimination based on the exercise of certain substantive rights. *See* 29 U.S.C. § 2615(a)(1), (2). Employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). A *prima facie* case of retaliation or discrimination for taking FMLA leave has three elements: (1) the Plaintiff invoked his right to FMLA leave, (2) he suffered an adverse employment action, and (3) he has demonstrated a causal link between the two. *See Dreibelbis v. Cty. of Berks*, No. 5:19-CV-4946, 2020 WL 605884, at *12 (E.D. Pa. Feb. 7, 2020) (citing *Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 759 (W.D. Pa. 2016), *aff'd sub nom. Caplan v. L Brands/Victoria's Secret Stores*, 704 F. App'x 152 (3d Cir. 2017)).

TD's challenge to the *prima facie* claims of both the ADA claim and the FMLA claim rest on the causation prong. Mr. LaVeglia has evidence to demonstrate causation, however. Mr. Whitehead praised Mr. LaVeglia's performance in February 2018. In March 2018, Mr. LaVeglia informed Mr. Whitehead that his wife had a disability, that his wife's condition had worsened, and that he planned to take a leave of absence. As late as May 11, 2018, TD's internal documents suggest that TD still planned to retain Mr. LaVeglia. But on May 16, 2018—12 days before Mr. LaVeglia went out on leave--Mr. Whitehead changed his mind and decided to terminate Mr. LaVeglia. That sequence of events is enough to raise an inference that the family members' disabilities, and Mr. LaVeglia's leave to tend to those disabilities, were a determining factor in Mr. Whitehead's decision. *Cf. Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 511 (3d Cir. 2009). Indeed, a reasonable juror could decide based on those events that Mr. Whitehead decided

that he did not want to deal with an employee whose family obligations necessitated taking FMLA leave or who might have ongoing distractions.

It its Motion, TD argues that it was understanding of Mr. LaVeglia's family situation and of his decision to take FMLA leave. It points out that no employee criticized Mr. LaVeglia, expressed antagonism, or made disparaging comments. That might be true, and the evidence might well persuade a jury. But at this stage of the proceedings, where the Court must consider the evidence in the light most favorable to Mr. LaVeglia, TD's spin on the evidence cannot carry the day.

TD also argues, with respect to the FMLA claim, that Mr. LaVeglia cannot show causation because it began the process of restructuring its ERE function long before Mr. LaVeglia decided that he intended to take FMLA leave. But the question before the Court is not when TD started the restructuring process. The question is when Mr. Whitehead made the decision to terminate Mr. LaVeglia. That decision came much later, not long after Mr. LaVeglia's family situation led to him taking leave and highlighted the ongoing distraction he might have at home.

### 2.    Legitimate nondiscriminatory reason

TD claims that terminated Mr. LaVeglia as part of its reorganization of the ERE Department. The Court concludes that that qualifies as a legitimate, non-discriminatory reason. Mr. LaVeglia does not argue otherwise.

### 3.    Pretext

To survive a motion for summary judgment after the employer articulates a nondiscriminatory reason for its action, a plaintiff must offer evidence from which a factfinder could reasonably either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To satisfy

the first prong, Mr. LaVeglia cannot "simply show that the decision was wrong or mistaken, but must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the employer was not actually motivated by its proffered nondiscriminatory reason." *Parker v. Verizon Pennsylvania, Inc.*, 309 Fed. Appx. 551, 556–57 (3d Cir.2009) (citing *Fuentes*, 32 F.3d at 765).

The Court does not find evidence of invidious discrimination here to support a finding of pretext. However, viewing the facts and drawing reasonable inferences in the light most favorable to Mr. LaVeglia, the Court finds that the record presents enough evidence that, taken together, demonstrates pretext. TD's conduct both before and after Mr. LaVeglia's termination reveal inconsistencies in its explanation for Mr. LaVeglia's termination.

*First*, TD's decision to terminate Mr. LaVeglia appears inconsistent with the praise that Mr. LaVeglia received for his job performance leading up to his termination. Mr. LaVeglia's job reviews were generally favorable from 2013 through 2017. Although his annual reviews included some criticism, the overall tenor of the reviews was favorable, and there is no evidence that TD placed Mr. LaVeglia on a performance improvement plan or otherwise gave him warnings about a need to improve. Then, in February 2018, Mr. Whitehead praised Mr. LaVeglia's performance. This performance history is at odds with TD's termination decision.

*Second*, TD changed course after planning to keep Mr. LaVeglia in his role. Documents that TD produced in discovery suggest that TD intended to retain Mr. LaVeglia. Indeed, a Communication Touch Plan for the ERE Department's reorganization indicates that, as late as May 2018, Mr. Whitehead was supposed to call Mr. LaVeglia and notify him that he would be assigned the new CFM position. Mr. Whitehead never placed that call. TD seeks to minimize the significance of the Communications Touch Plan by arguing that Mr. Whitehead was not aware of

it or its creation. But a reasonable juror could infer from its creation that TD intended to award Mr. LaVeglia the job at that time, even if Mr. Whitehead was not aware of the creation of the document itself.

*Third*, at least one witness contradicts TD's contention that it did not have any jobs available for Mr. LaVeglia in the reorganized ERE Department when it terminated him. Mr. Jabaut, one of the HR representatives assigned to the ERE Department, testified that the TSP role remained vacant for months after Mr. LaVeglia's termination.

*Fourth*, TD's assignment of Mr. Gould both to the CFM and the TSP role after Mr. LaVeglia's termination calls into question TD's explanation for Mr. LaVeglia's termination. TD claims that it eliminated Mr. LaVeglia's role as Head of ERE Operations because it was too big for one person. It therefore split the role into two: CFM and TSP. It assigned the CFM role to Mr. Gould but left the TSP role open. Mr. Gould performed the functions of that role too, but for a brief span when TD hired an external candidate. So in the end, TD decided the role was not too big for one person, and a reasonable juror could conclude that TD did not, in fact, eliminate the position.

While it is possible that none of these inconsistencies, standing alone, could rebut TD's proffered reason for terminating Mr. LaVeglia, the Court must consider "the totality of the evidence," and not "the strength of each argument" in conducting a pretext analysis. *Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir. 1997); *see also Oliver v. Clinical Practices of the Univ. of Pa.*, 921 F. Supp.2d 434, 449 (E.D. Pa. 2013).  The Court recognizes that TD may have legitimate, nondiscriminatory reasons for all its conduct at issue in this case. However, at this juncture the Court must view the evidence in the light most favorable to Mr. LaVeglia. Through that lens there is enough circumstantial evidence that, taken together, allows Mr. LaVeglia to meet his burden.

### C.      Contract Claim

To prove a breach of contract, Mr. LaVeglia must prove: (1) the existence of a contract including its essential terms; (2) breach of a duty imposed by the contract; and (3) resultant damages. *Atchison v. Sears*, 666 F. Supp. 2d 477, 497 (E.D. Pa. 2009) (citing *Walker Co. Inc. v. Excalibur Oil Group, Inc.,* 792 A.2d 1269, 1272 (Pa.Super.2002)). The parties clash over whether TD's Parental Leave Policy created a contract that altered the default rule of employment-at-will. It did not.

"Absent a clear intent to the contrary, all employment relationships in Pennsylvania are considered employment-at-will, meaning that an employer can discharge an employee at any time for any reason." *Atchison v. Sears*, 666 F. Supp. 2d 477, 496 (E.D. Pa. 2009) (quoting *Erdman v. Nationwide Ins. Co.,* 510 F.Supp.2d 363, 375–76 (M.D.Pa.2007)). "In order to rebut the presumption of at-will employment, a party must establish one of the following: (1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception." *Janis v. AMP, Inc.,* 856 A.2d 140, 144–45 (Pa. Super.2004). Mr. LaVeglia does not present evidence of any of these four criteria, and the Court finds none in the record.

In addition, the Policy itself states that it is not a contract. Mr. LaVeglia acknowledges receiving and reviewing this Policy. Under such circumstances, courts decline to find the existence of a contract. *See, e.g.*, *Henderson v. NutriSystem, Inc.*, 634 F. Supp. 2d 521, 535–36 (E.D. Pa. 2009) ("defendant's handbooks and the plaintiff's signatures acknowledging receipt of those handbooks undermines any argument that the facts of this case imply a 'common understanding ... to contract' so as to provide for contractual benefits like those claimed by the plaintiff."). The Court concludes that Mr. LaVeglia has no evidence to permit the conclusion that he agreed with TD to alter the default rule of employment-at-will.

## IV.     CONCLUSION

Mr. LaVeglia has enough evidence to survive summary judgment on his discrimination claims, but not on his breach of contract claim. A jury will have to sort out Mr. LaVeglia's claims of discrimination and TD's explanations for its actions. However, Mr. LaVeglia lacks the evidence to justify submitting his breach of contract dispute to the jury. Accordingly, the Court will grant TD's motion as to the breach of contract claim but will otherwise deny it. An appropriate Order follows.

BY THE COURT:

*ls/ Joshua D. Wolson*
**JOSHUA D. WOLSON, J**.

Date: May 15, 2020